UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

ALYTON WRIGHT,

                                        Plaintiff,

           vs.                                                    9:07-CV-473
                                                                  (LEK/ATB)
MARYANN GENOVESE, et al.,

                                        Defendants.
_____

ALYTON WRIGHT, Plaintiff pro se
C. HARRIS DAGUE, AAG, Attorney for Defendants Genovese, Capone, and Wright
KATHLEEN M. RYAN, ESQ., Attorney for Defendant Miller

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT-RECOMMENDATION

       This matter has been referred to me for Report and Recommendation, pursuant

to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c), by the Honorable Lawrence

E. Kahn, Senior United States District Judge.

       In this civil rights complaint, plaintiff alleges that defendants denied him

constitutionally adequate medical care and equal protection of law, while plaintiff was

an inmate in the custody of the Shawangunk Correctional Facility ("Shawangunk").

He seeks declaratory and injunctive relief, as well as substantial damages.

       Presently before this court are two motions for summary judgment, pursuant to

FED. R. CIV. P. 56–one filed on behalf of defendant Miller, a private physician at

Albany Medical Center (Dkt. No. 96), and the second submitted for defendants

Genovese, Capone, and Wright, physicians who were employed by, or contractors for,

the Department of Correctional Services (DOCS) (Dkt. No. 97).[1]  Plaintiff filed a

response to the motion filed by the DOCS defendants (Dkt. No. 102), but did not

respond directly to the motion filed by Dr. Miller.   For the following reasons, this

court recommends that the defendants' motions for summary judgment both be

granted and the complaint dismissed.

## DISCUSSION

**I.   Facts**

      Plaintiff was an inmate at Shawangunk during all times relevant to this action.

In late 2005 and 2006, plaintiff was examined and treated by medical personnel,

including Dr. Maryann Genovese, a physician at Shawangunk employed by DOCS,

and Dr. Robert Capone, a retired cardiologist at the Albany Medical Center ("AMC")

and part-time consultant for DOCS.  Plaintiff was referred for an echocardiogram,

stress test, and ultimately, a cardiac catheterization, which was performed by Dr. Jan

Houghton at AMC on April 13, 2006.  (Atty. Ryan Aff. in support of Miller Sum.

Jdgm. Mtn., Dkt. No. 96-2, ¶10; Ex. D12 (DOCS Medical Records), Dkt. No. 96-17,

at DOCS-282-291, 294-295, 298-299, 304-305).[2]  Plaintiff was then referred to

---

[1] Plaintiff's complaint named various other defendants, who have been terminated from the action as a result of plaintiff's motion to dismiss them.  (Dkt. Nos. 52, 58)

[2] Both the Miller and Genovese/Capone/Wright summary judgment motions append voluminous medical records from the Shawangunk facility and DOCS.  The DOCS records attached to the Miller motion were filed as Exhibits D-1 through D-13 (Dkt. Nos. 96-6 through 96-13) and have consecutive page numbers starting with "DOCS-0001."  The DOCS records attached to the Genovese/Capone/Wright motions are attached as Exhibits 1 through 7 to the Affidavit of defendant Genovese (Dkt. No. 97-4 through 97-10) and have consecutive page numbers starting with "D1."  The DOCS medical records will be referred to herein by the "DOCS" or "D" numbers.

defendant Dr. Stuart Miller, a private thoracic surgeon with privileges at AMC.[3]   On

April 17, 2006, Dr. Miller performed coronary bypass surgery on plaintiff (then age

43) at AMC.   (Miller Aff., Dkt. No. 96-40, ¶¶ 16-21; DOCS-304-305).

The plaintiff tolerated his surgery well, and, after being discharged from AMC

on April 21, 2006, he was returned to the medical unit at Shawangunk for post-

operative treatment and observation.   (Genovese Aff., Dkt. No. 97-3, ¶10; Ex. 2

(DOCS medical records), D78).   Contrary to the allegations in the complaint (Dkt. No.

1 at 5, ¶ 6), Dr. Miller's discharge instructions were forwarded to Shawangunk; three

copies were included in plaintiff's medical records from DOCS.   (Miller Aff. ¶ 32;

DOCS-279-280, 292-293, 304-305).   After reviewing the relevant DOCS medical

records, the surgeon, Dr. Miller, concluded that the immediate post-operative

treatment provided by Dr. Genovese and others at Shawangunk was appropriate and

consistent with his discharge instructions.   (Miller Aff. ¶¶ 33-34).   Dr. Genovese

prescribed a battery of cardiac and pain medications recommended by plaintiff's

surgeon; a few of the drugs had different brand names, but had equivalent active

ingredients.   (Genovese Aff. ¶¶ 11, 12; Miller Aff. ¶¶ 29, 33).

By April 25, 2006, the medical staff at Shawangunk determined that the

plaintiff was not suffering from any acute complications from his surgery, and

---

[3] As discussed in more detail below, AMC had a contract with DOCS that provided for
medical treatment of DOCS inmates in a secure inpatient unit at AMC.   Dr. Miller and other
members of his professional practice  (Capital Cardiology) were not employees of AMC, but had
admitting privileges, and were often requested to provide consultations and surgery to DOCS
patients at AMC.   Neither Dr. Miller, nor his practice group, had any employment or contractual
relationship with DOCS.   (Miller Aff. ¶¶ 8-15 & Ex. C., Dkt. No. 96-5).

returned him to the facility's general population.  (Genovese Aff. ¶ 10; D79).  Plaintiff complains that he was denied appropriate follow-up medical care in that: (1)  he was not appropriately excused from strenuous prison labor, which impeded his recovery and caused him considerable pain; (2) he was not scheduled for a follow-up examination with his surgeon, pursuant to post-operative instructions; and (3) he was not provided adequate prescription medication, in particular sufficient medication to manage his post-operative pain.  (Complaint at 9-10).

Consistent with the discharge instructions from the surgeon, Dr. Miller, Dr. Genovese completed a "Medical No-Duty Status" form directing that the plaintiff was to do "no heavy lifting pushing pulling" and excusing him from his a.m. and p.m. programs for the period between April 25 and May 30, 2006.  (D95).  Contrary to Dr. Genovese's recent declaration that she initially assigned plaintiff to bed rest and meals in his cell (Dkt. No. 97-3, ¶ 10), she checked the "No" box for "Bed Rest" and "Feed in Cell" on the form she completed in April 2006.

According to plaintiff, "immediately" upon his re-assignment to general population, he was returned to his job program in grounds keeping, which necessarily included heavy lifting, pushing, and pulling, and which exacerbated his post-operative pain.  (Complaint at 6, ¶¶ 8, 9).  In response to the summary judgment motion, plaintiff stated that "[o]nly after repeated complaints of pain . . . to medical personnel, . . . did any medical personnel get the understanding that plaintiff's assigned work program consisted of performing strenuous upper body activity . . . ."  (Pl. Dec., Dkt. No. 102-1, ¶¶ 17-20).  However, the DOCS medical records for April and May 2006

4

do not reflect any complaints from plaintiff regarding pain related to his work or other information that would have put Dr. Genovese or Dr. Capone on notice that, contrary to medical orders, plaintiff was being required to engage in strenuous work during the month following his surgery.  (D41-D45, D99).

DOCS did not schedule a follow-up appointment with the plaintiff's surgeon, Dr. Miller, contrary to the discharge directions.  (Miller Aff. ¶¶ 31, 32; DOCS-305). Instead, plaintiff was referred for a consultation on May 11, 2006 with Dr. Capone, the part-time cardiology consultant for DOCS.  (Genovese Aff. ¶ 25; D42, D99, D124).  Dr. Genovese stated that she did not have the "final say" regarding whether or when consultations she recommended would be scheduled; but she noted that "Consultation with a Cardiologist to treat [plaintiff's] on-going condition and recovery from surgery was appropriate."  (Genovese Aff. ¶ 25).  While Dr. Miller stated that it was the responsibility of DOCS to schedule a follow-up visit, he noted: "Routinely, surgical patients are discharged back to the cardiologist for follow-up.  Certainly, if the cardiologist had any concerns about a patient's possible need for subsequent surgery or further medication, he or she would have contacted my office.  (Miller Aff. ¶ 36).  Dr. Capone concluded that, at least until March 2007, plaintiff was not suffering from any complications from the surgery that required a consultation with the surgeon.  "Had the plaintiff been experiencing issues with the incision site, *e.g.* infection, non-closure, swelling, I would have been more apt to recommend to his facility physician that he see Dr. Miller.  This, however, was not the case with plaintiff."  (Capone Aff., Dkt. No. 97-11, ¶¶ 17).

In the month following his surgery, plaintiff was treated with Percocet to manage his pain, in accordance with the direction of Dr. Miller (Miller Aff. ¶ 33; DOCS-305) and the recommendation of Dr. Capone (Capone Aff. ¶ 11; D99).  During much of this time period, plaintiff was receiving Percocet three times per day. (Genovese Aff. ¶ 15; D81-82).  The medical records reflect the medical judgment of the DOCS medical staff that, by May 11, 2006, the plaintiff should be weaned from Percocet and transitioned to non-prescription pain relievers, such as Tylenol.  (D42, D99).

The DOCS medical records document that plaintiff started complaining about substantial chest pain in early June 2006, after his medical work restrictions lapsed and after Dr. Genovese stopped prescribing Percocet.  (D33-D41).  Plaintiff claims that Dr. Genovese advised him that she would no longer prescribe pain medications because he was "a drug addict."  (Pl. Aff., Dkt. No. 102-2 at 3, ¶ 18).  Dr. Genovese only indirectly responds to this claim by stating "My provisioning of pain medication to plaintiff was based upon my own medical judgment after observing and treating the patient following his surgery."  (Genovese Aff. ¶ 17).

On or about June 21, 2006, plaintiff filed a grievance, claiming he was not receiving the proper pain medication.  (Complaint at 7, ¶ 15).  Defendant Dr. Lester Wright, the Chief Medical Officer for DOCS referred the complaint to RHSA (Regional Health Services Administrator) Pedro Diaz, who investigated the matter. On July 18, 2006, Mr. Diaz wrote plaintiff that the facility health services director (Dr. Genovese) was the final arbiter regarding the appropriate medications to prescribe for

the plaintiff.  (DOCS-330).[4]

In June and July, plaintiff was treated by the medical staff at Shawangunk more than a dozen times.   On June 29, 2006, Dr. Genovese issued new "Medical No-Duty Status" orders that the plaintiff should not be required to do heavy lifting, pushing, or pulling for the next six months.  (D97).  She followed up with a Memorandum to the Programming Committee at Shawangunk confirming the limitations of the plaintiff's physical activities.  (DOCS-326).  Dr. Genovese also referred plaintiff for a chest X-ray in early July, which revealed no objective source of his chest pain.  (DOCS-190, 339; D35).  From July 12 through 31, 2006, Dr. Genovese again prescribed Percocet to the plaintiff, reducing the dosage from twice per day to a single daily dose for the last week.  (D35, D37, D83-84).  Then, the medical staff started using Naprosyn to address plaintiff's pain.  (D35).

After at least two more complaints regarding chest pain, plaintiff was referred again to cardiologist, Dr. Capone on August 16, 2006.  (D32-33, 102).  Dr. Capone recommended that plaintiff be prescribed Percocet; but Dr. Genovese, after reviewing the results of the consultation, continued to rely on Naprosyn to manage plaintiff's pain.  (D30, 32, 102).

For the balance of 2006, plaintiff continued to seek medical treatment at

---

[4] Mr. Diaz's letter (dated July 18, 2006) erroneously refers to the date of plaintiff's grievance as **July** 26, 2006.  Plaintiff claims that he exhausted his administrative remedies by filing this grievance and appealing the denial to Albany DOCS Central Office Review Committee (CORC), which upheld the adverse decision.  (Complaint at 15).  Although none of the parties attach copies of any documents relating to the grievance other than the Diaz letter, the defendants do not assert that plaintiff failed to exhaust his administrative remedies in the summary judgment motions.

Shawangunk, complaining of pain, not only in his chest, but in his shoulder and ribs. The DOCS medical staff continued to try to ensure that plaintiff's work programs did not involve inappropriately strenuous upper body work.  (D28).[5]  Plaintiff's treating doctors prescribed different medications, including the muscle relaxant Robaxin.[6] (D27).  On November 8, 2006, plaintiff was again examined by Dr. Capone, who recommended physical therapy, which was prescribed for approximately six week. (D100, 101, 103-112).

The physical therapist recommended that the plaintiff be examined by his surgeon.  (D101; DOCS-221).  After plaintiff wrote Dr. Genovese in early 2007 requesting to be examined by Dr. Miller, an administrative official at Shawangunk advised plaintiff that follow-up would be through a cardiologist.  (DOCS-327-329; D22).

Plaintiff alleges that, on three occasions, he wrote Dr. Miller with questions about his care, but that the surgeon never responded.  (Complaint at 9, ¶ 30).  Dr. Miller states that the plaintiff wrote him only once, in January 2007, claiming that his pain medication had been stopped too early, and that he was not being given appropriate post-operative care.  (Miller Aff. ¶ 35; Ex. F-3, Dkt. No. 96-39 at 1).  Dr.

---

[5] Plaintiff admits that, by late 2006, he was in a work program that involved no heavy lifting, pushing, or pulling.  He stated that he did not seek further relief from his work assignments during this time period because of the less strenuous nature of the work.  (Pl. Dec. ¶ 20).

[6] *See* http://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?id=1254, for a description of Robaxin on the DailyMed website, a service of the National Library of Medicine of the National Institutes of Health.

Miller explained that he did not respond to plaintiff's letter because he assumed his care was being overseen by a cardiologist who would have referred the inmate back to the surgeon if the plaintiff was suffering complications.  Dr. Miller also stated: "It is my belief that none of my cardiothoracic patients, including the plaintiff, would require pain medication nearly eight months after surgery."  (Miller Aff. ¶ 36).

Plaintiff was again seen by Dr. Capone on March 23, 2007, and he recommended a consultation with plaintiff's surgeon.  (D113).  In his affidavit, Dr. Capone explained: "Following my fourth consultation with plaintiff on March 23, 2007, in light of his repeated complaints of lingering chest wall pain I made a recommendation in his chart that he be examined by Dr. Miller. . . .  Based upon my previous examinations of plaintiff, I did not consider such a consultation necessary until this time.  (Capone Aff. ¶ 18).  Dr. Genovese approved the referral to the thoracic surgeon on April 18, 2007.  (DOCS-206, 208).

Dr. Miller examined plaintiff on June 18, 2007 at Albany Medical Center.[7]  The plaintiff complained of intermittent chest pain and expressed concern about the difference in size of his two pectoralis major muscles.  Dr. Miller concluded that any pain was not cardiac in nature, but was musculoskeletal.  He did not perceive any difference in the relative size of the muscles that plaintiff was concerned about and recommended that he continue to work out to rebuild muscle mass.  Dr. Miller recommended that a cardiologist could do any appropriate follow-up.  (Miller Aff. ¶¶

---

[7] There were apparently some delays in plaintiff's appointment because of Dr. Miller's busy schedule.  (Ex. F-1, Dkt. No. 96-37 at 7; Ex. F-2, Dkt. No. 96-38 at 10, 12).  In the interim, plaintiff filed his complaint, on May 2, 2007.

38-42; Ex. F-1, Dkt. No. 96-37, at 1-4; DOCS-207; D125).

Following his examination by Dr. Miller, plaintiff continued to receive medical attention at Shawangunk for claims of pain in his chest, ribs, and shoulder. (D1-D16). Dr. Genovese issued another "Medical No-Duty Status" form, restricting plaintiff from engaging in heaving lifting, pushing, pulling, or weight lifting. (D98). Plaintiff had a least one further consultation with a cardiologist (other than Dr. Capone) on February 6, 2008. (DOCS-202).

Defendants allege that, during the course of his treatment at Shawangunk, plaintiff refused prescribed treatment or was non-compliant with the direction of the medical staff with some frequency. As documented in the Affidavit of Dr. Genovese and the cited DOCS medical records, plaintiff periodically skipped or refused to take cardiac and blood pressure medication. (Genovese Aff. ¶ 13). He frequently declined to take Ibuprofen or non-steroidal anti-inflammatory drugs ("NSAIDs") such as Naprosyn because he wanted something stronger. (Genovese Aff. ¶ 16). He refused to continue with a low-fat, therapeutic diet, missed approximately 28 of his 54 scheduled appointments for blood pressure checks, and was not compliant with the directions of his physical therapist. (Genovese Aff. ¶¶ 30-32). Plaintiff also resisted physical restrictions placed on him by the medical staff, expressing his desire to return to engaging in "heavy work." (Genovese Aff. ¶ 33; D14-15).

Plaintiff offers explanations for the various instances of his purported resistance to treatment and medication prescribed by the medical staff at Shawangunk. He claims that he discontinued the therapeutic diet and missed blood pressure check-ups

10

because he was physically unable to walk to the distant locations in the prison where these services were offered.  He failed to comply with the direction of the physical therapist only when he was physically incapable of doing what was asked.  (Pl. Dec. ¶¶ 31-33).  Plaintiff claims that his lamentations about his inability to perform the heavy work in which he previously engaged as a construction worker were misconstrued as a refusal to stop engaging in strenuous labor at Shawangunk.  (Pl. Dec. ¶ 22).   He denies that he refused non-prescription pain medications, but only explained that they were ineffective in relieving his severe pain.  (Pl. Dec. ¶¶ 14, 16). However, the medical records corroborate that the defendant resisted the direction of the medical staff, particularly with respect to their efforts to wean him from Percocet and try to manage his pain with non-prescription medications.  (Genovese Aff. ¶ 16; D-2, 13, 15, 27, 28, 41).

## II.   **Summary Judgment**

The amended complaint alleges that the defendants showed deliberate indifference to plaintiff's medical needs in connection with his post-operative care. Plaintiff also recasts that same basic claim as a denial of his Fourteenth Amendment due process and equal protection rights, alleging that Dr. Genovese's decisions regarding what medications to prescribe were influenced by her perception of plaintiff as a "drug addict."

Defendant Miller, the surgeon at the Albany Medical Center, has moved for summary judgment, arguing that there is no factual support for the claim (1) that he acted under color of state law when he provided medical treatment to plaintiff or (2)

11

that defendant Miller was deliberately indifferent to plaintiff's medical need.

Defendants Genovese, Capone, and Wright, the physicians employed or under contract with DOCS, have moved separately for summary judgment, arguing (1) that, to the extent the defendants are named in their official capacity, they are entitled to Eleventh Amendment immunity; (2) that there are no facts in the record to support the claim that the defendants were deliberately indifferent to plaintiff's medical needs; (3) that, as to Defendant Wright, he had no personal involvement in plaintiff's care and thus cannot be held liable under Section 1983; (4) that plaintiff's Fourteenth Amendment claim is unsubstantiated; and (5) these defendants are protected by qualified immunity.

For the reasons set forth below, this court concludes that all of the defendants are entitled to summary judgment on plaintiff's Eighth Amendment medical care cause of action because there is no factual support for the claim that they provided unreasonable care or acted with deliberate indifferent to plaintiff's medical needs. The Court would also recommend granting summary judgment on plaintiff's Fourteenth Amendment claim, which is mis-pled and should be subsumed within plaintiff's Eighth Amendment cause of action.  This court concludes that it is not necessary to resolve other issues raised by the defendants, including Dr. Miller's argument that he was not acting under color of state law and the position of the other defendants that they are protected by qualified immunity   Accordingly, this court recommends that the complaint should be dismissed, in its entirety, against all of the remaining defendants.

12

### A.     Legal Standards for Summary Judgment

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact.  FED. R. CIV. P. 56; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990) (citations omitted).  Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion.  *Id*.  However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the nonmovant bears the burden of proof at trial, the moving party may show that he is entitled to summary judgment by either (1) pointing to evidence that negates the nonmovant's claims or (2) identifying those portions of the nonmovant's evidence that demonstrate the absence of a genuine issue of material fact.  *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006) (citing *Celotex Corp.*, 477 U.S. at 323).  The second method requires the movant to identify evidentiary insufficiency, not merely to deny the opponent's pleadings.  *Id*.

13

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial.  *Id.*  "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude summary judgment." *Salahuddin v. Coughlin*, 674 F. Supp. 1048, 1052 (S.D.N.Y. 1987) (citation omitted). A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [fact finder] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

While a court "'is not required to consider what the parties fail to point out,'" the court may in its discretion opt to conduct "an assiduous view of the record" even where a party fails to respond to the moving party's statement of material facts.  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (citations omitted).  Plaintiff in this case has responded to appropriately to the motion of defendants Genovese, Capone, and Wright, but has not directly addressed the motion of Defendant Miller, particularly with regard to his "state action" argument.  However, the court will still carefully review the entire record in making its determination.

### B.    Eleventh Amendment

It is now well-settled that the state itself cannot be sued under section 1983. *Komlosi v. New York State OMRDD*, 64 F.3d 810, 815 (2d Cir. 1995) (citing *Will v. Michigan Department of Police*, 491 U.S. 58, 71 (1989)).  This is true whether the

court is considering Eleventh Amendment immunity or a statutory interpretation of section 1983. *Id.* at 815 n.3.  An action against state officers in their official capacities is tantamount to an action against the state. *Yorktown Medical Laboratory, Inc. v. Perales*, 948 F.2d 84, 87 & n.1 (2d Cir. 1991) (citations omitted).

The amended complaint does not specify whether the DOCS defendants are being sued in their individual or official capacity.  The DOCS defendants correctly argue that, to the extent that they are being sued in their official capacity for money damages, that cause of action should be dismissed under the Eleventh Amendment. *Huang v. Johnson*, 251 F.3d 65, 69-70 (2d Cir. 2001); *Posr v. Court Officer Shield #207*, 180 F.3d 409, 414 (2d Cir. 1999).  Thus, to the extent that the amended complaint can be read to allege claims for damages against defendants in their official capacity, the court will recommend dismissal of any such claim, and will evaluate the complaint assuming that it makes claims against the DOCS defendants in their individual capacity.

## C.    State Action (Defendant Miller)

To state a claim under Section 1983, "a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).  The opinion in *West v. Atkins* elaborated on the "state action" requirement of Section 1983:

> The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the

authority of state law." . . .

> To constitute state action, "the deprivation must be caused by the exercise of some right or privilege created by the State . . . or by a person for whom the State is responsible," and "the party charged with the deprivation must be a person who may fairly be said to be a state actor."

*Id.* at 49 (citation omitted).

Defendant Miller argues that he is entitled to summary judgment as a matter of law because, when he was providing medical treatment to defendant, he was not a state actor, and thus was not "acting under color of state law."  As Dr. Miller's affidavit and supporting documentation establish, AMC had a contract with DOCS that provided for medical treatment of DOCS inmates in a secure inpatient unit at AMC.  Dr. Miller and other members of his professional practice  (Capital Cardiology) were not employees of AMC, but had admitting privileges, and were "often" requested to provide consultations and surgery to DOCS patients at AMC.  Neither Dr. Miller, nor his practice group, had any employment or direct contractual relationship with DOCS.  (Miller Aff. ¶¶ 8-15 & Ex. C., Dkt. No. 96-5 at 10, 16-19).[8]

In *West v. Atkins*, the Supreme Court explained why it extended the logic of *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) to hold that a private physician who,

---

[8] In this case, although he received proper notice of his obligation to respond to defendant's motion in accordance with Local Rules (Dkt. No. 97-1), the plaintiff did not file a statement of undisputed material facts responding to defendant Miller's motion, as required by Local Rule 7.1(a)(3).  Consequently, the court may accept the properly supported facts contained in the defendant's Rule 7.1 statement (Dkt. No. 97-2) as true for purposes of this motion.  *See, e.g., Govan v. Campbell*, 289 F. Supp. 2d 289, 295-296 (N.D.N.Y. 2007) and cases cited therein. In any event, it is unlikely that the plaintiff would have access to information to contradict defendant Miller's documentation of the contractual or other arrangements among and between him, his professional practice group, Albany Medical Center, and DOCS.

16

pursuant to a contact with the state, provided medical services to state inmates in the prison setting, was, like a physician employed by the state, acting under color of state law and subject to suit under Section 1983:

> . . . It is the physician's function within the state system, not the precise terms of his employment, that determines whether his actions can fairly be attributed to the State. . . . Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive the State's prisoners of the means to vindicate their Eighth Amendment rights. The State bore an affirmative obligation to provide adequate medical care to [the inmate plaintiff]; the State delegated that function to respondent [physician]; and respondent voluntarily assumed the obligation by contract.
>
> . . . It is the physician's function while working for the State, not the amount of time he spends in performance of those duties or the fact that he may be employed by others to perform similar duties, that determines whether he is acting under color of state law.
>
> . . . [T]he fact that a state employee's role parallels one in the private sector is not, by itself, reason to conclude that the former is not acting under color of state law in performing his duties. . . .
>
> Moreover, although the provision of medical services is a function traditionally performed by private individuals, the context in which respondent [physician] performs these services for the State (quite apart from the source of remuneration) distinguishes the relationship between respondent and [the inmate plaintiff] from the ordinary physician-patient relationship. . . . Respondent carried out his duties at the state prison within the prison hospital. That correctional setting, specifically designed to be removed from the community, inevitably affects the exercise of professional judgment. Unlike the situation confronting free patients, the nonmedical functions of prison life inevitably influence the nature, timing, and form of medical care provided to inmates such as [the plaintiff].

*West v. Atkins*, 487 U.S. at 55-57 & n.15 (citations omitted).

Defendant Miller argues that the circumstances under which he provided

medical services to plaintiff–in a private hospital setting and not pursuant to a contract

with DOCS–distinguishes him from the physician/contractor in *West v. Atkins* and

compels the conclusion that he is not a state actor.  In support of this position,

defendant Miller sites the opinion of U.S. District Judge Hurd in  *Nunez v. Horn*,

holding, in the alternative, that a physician who, **without a contractual relationship**

**with DOCS**, performed surgery on a state inmate **in a private hospital**, did not act

under color of state law.  *Nunez v. Horn*, 72 F. Supp. 2d 24 (N.D.N.Y. 1999).

There are, however, some additional circumstances regarding the relationship

between Dr. Miller, AMC, DOCS, and the plaintiff/patient that complicate the

analysis of whether Dr. Miller performed surgery on the plaintiff while acting under

color of state law.  As Dr. Miller admits, AMC had a contract with DOCS to provide

medical services to state inmates in a secure wing of the hospital in which DOCS

personnel guarded the inmates.[9]  While a secure wing within a private hospital is a less

controlled, coercive environment than a medical facility within a prison, that setting

may influence the nature, timing, and form of medical care provided to inmates, even

by private physicians.  *Compare Sykes v. McPhillips*, 412 F. Supp. 2d 197, 202

(N.D.N.Y. 2006) (the fact that a hospital accommodated particular security measures

---

[9] In the contract, AMC and DOCS agree to the creation of a 10-bed secure unit at AMC to treat inmates.  Section III. 3. of the contract provides that " . . .  AMC and the physicians attending said [inmate] patient shall be solely responsible for rendering medical care to the inmate patient, as the same is rendered to regular and normal patients at AMC."  Section III. 5. provides: "It shall at all times be the responsibility of the DEPARTMENT to provide adequate and proper security and supervision of the patients admitted to AMC who are in the custody and control of the DEPARTMENT, and this shall be true whether they are in the secure unit or any other part of AMC."  (Ex. C, Dkt. No. 96-5 at 6).

in the emergency room characteristic to incarceration does not mean the hospital voluntarily assumed the function of the state) *with Rodriguez v. Plymouth Ambulance Service*, 577 F.3d 816, 831-832 (7th Cir. 2009) (where the private hospital had a prison ward, and there were other indicia of an ongoing relationship with the prison authorities for care of prisoner-patients, the staff members providing medical service therein would be state actors).

While Dr. Miller and his practice group were not a party to the AMC contract with DOCS, they had an ongoing relationship with AMC and "often" provided consultation and surgery services to state inmates.  (Miller Aff. ¶ 14).  Moreover, they apparently benefitted from the AMC/DOCS contract in at least two respects.  The contract appears to set forth the terms of the reimbursement, by DOCS, of private physicians for treatment of inmates at AMC at 167% of Medicare rates.  The contract also provides treating physicians with indemnification by DOCS if they were to be sued by an inmate/patient for professional negligence.  (Ex. C., Dkt. No. 96-5 at 2, 10, 13, 16-19).[10]  *See West v. Atkins*, 487 U.S. at 49 (to constitute state action, the constitutional deprivation must be caused by a person "for whom the state is responsible.")  The existence of a formal or informal contractual arrangement between a hospital and prison authorities makes it more appropriate to classify the staff of the hospital involved with treating inmates as state actors.  As the Seventh Circuit

---

[10] The indemnity provisions of the AMC contract with DOCS appear to extend, to medical professionals who provide medical services at AMC to inmates at the request of DOCS, the protections afforded by N.Y. Correction Law § 24-a and Public Officers Law § 17, which would indemnify the professionals as to any claims of negligence by the inmate.  (Ex. C., Dkt. No. 96-5 at 18).

reasoned in *Rodriguez*:

> When a party enters into a contractual relationship with the state penal institution to provide specific medical services to inmates, it is undertaking freely, and for consideration, responsibility for a specific portion of the state's overall obligation to provide medical care for incarcerated persons. In such a circumstance, the provider has assumed freely the same liability as the state. Similarly, when a person accepts employment with a private entity that contracts with the state, he understands that he is accepting the responsibility to perform his duties in conformity with the Constitution.
>
> In contrast, private organizations and their employees that have only an incidental and transitory relationship with the state's penal system usually cannot be said to have accepted, voluntarily, the responsibility of acting for the state and assuming the state's responsibility for incarcerated persons. For instance, an emergency medical system that has a preexisting obligation to serve all persons who present themselves for emergency treatment hardly can be said to have entered into a specific voluntary undertaking to assume the state's special responsibility to incarcerated persons.

*Rodriguez v. Plymouth Ambulance Service*, 577 F.3d at 827-828.  *See also Burgess v. County of Rensselaer*, 1:03-cv-652 (NPM-RFT), 2006 WL 37929750 at *2-*4, 2006 U.S. Dist. LEXIS 91521 (N.D.N.Y. Dec. 18, 2006) (nurses employed by an agency that had a contract to provide medical services to inmates in a prison setting were state actors under Section 1983, distinguishing *Nunez v. Horn*); *Davis v. Cole-Hoover*, No. 03CV550, 2004 WL 1574649, at *10, 2004 U.S. Dist. LEXIS 13836 (W.D.N.Y. June 14, 2004) ("The question of whether [the hospital] (and its affiliated medical personnel) is a state actor ... turns on the contractual relationship [the hospital] had with DOCS.")[11]

---

[11] Dr. Miller establishes that he was not an employee of AMC, but does not elaborate on the formal or informal arrangements between AMC and the doctors who have admitting privileges there.

Many of the relevant factual nuances regarding the relationship between Dr. Miller, AMC, DOCS, and DOCS inmate/patients–*e.g.,* the nature of the contractual or other arrangements between AMC and doctors with admitting privileges–have not been fully developed by the summary judgment motion.  Moreover, the established facts regarding those relationships appear to place the question of whether Dr. Miller was a state actor in this case in a gray area not clearly resolved by existing case law. As discussed below, this court will recommend that summary judgment be granted as to defendant Miller based on the absence of any factual support for the allegation that the surgeon provided unreasonable care or acted with deliberate indifference to plaintiff's medical needs.  Accordingly, it is not necessary to decide the state action issue to resolve the pending motion.  *See, e.g., Young v. Smith*, 07-CV-6312, 2009 WL 3733048 at *4-*5, 2009 U.S. Dist. LEXIS 102965 (W.D.N.Y. Nov. 5, 2009) (because it was clear that defendant doctor did not act with "deliberate indifference," the court did not resolve whether he acted under color of state law as an employee of a company under contract with a hospital that had an ongoing working relationship with DOCS and a secure, designated area for the treatment of inmate patients).

### D.  Claims of Inadequate Medical Care

#### 1.  Legal Standards

In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  There are two elements to the deliberate

21

indifference standard. *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing inter alia *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

### a.   Objective Element

In order to meet the objective requirement, the alleged deprivation of adequate medical care must be "sufficiently serious." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Determining whether a deprivation is sufficiently serious also involves two inquiries. *Id.* The first question is whether the plaintiff was actually deprived of adequate medical care. *Id.* Prison officials who act "reasonably" in response to the inmates health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care." *Id.* (citing *Farmer*, 511 U.S. at 844-47).

The second part of the objective test asks whether the purported inadequacy in the medical care is "sufficiently serious." *Id.* at 280. The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff. *Id.* (citing *Helling v. McKinney*, 509 U.S. 25, 32-33 (1993)). If the "unreasonable care" consists of a failure to provide ***any*** treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Id.* (citing *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003)). However, in cases such as this one, where the inadequacy is in the medical treatment that was actually afforded

22

to the inmate, the inquiry is narrower. *Id.*  If the plaintiff is receiving ongoing treatment, and the issue is an unreasonable delay or interruption of the treatment, then the "seriousness" inquiry focuses on the challenged delay itself, rather than on the underlying condition alone. *Id.* (citing *Smith*, 316 F.3d at 185).  Thus, the court in *Salahuddin* made clear that although courts speak of a "serious medical condition" as the basis for an Eighth Amendment claim, the seriousness of the condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability.  *Id.* at 280.

### b.    Subjective Element

The second element is subjective and asks whether the official acted with "a sufficiently culpable state of mind." *Id.* (citing *Wilson v. Seiter*, 501 U.S. 294, 300 (1991)).  In order to meet the second element, plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care.  *Id.* (citing *Farmer*, 511 U.S. at 835-37).  Instead, plaintiff must show that the defendant was "deliberately indifferent" to that serious medical condition. *Id.*  Deliberate indifference is equivalent to subjective recklessness. *Id.* (citing *Farmer*, 511 U.S. at 839-40).

In order to rise to the level of deliberate indifference, the defendant must have known of and disregarded an excessive risk to the inmate's health or safety.  *Id.* (citing *Chance*, 143 F.3d at 702).  The defendant must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must draw that inference. *Chance*, 143 F.3d at 702 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).  The defendant must be subjectively aware that his or her

conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer*, 511 U.S. at 844. Thus, the court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin* 467 F.3d at 281.

Additionally, a plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001). Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986). The fact that plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds*, 151 F. Supp. 2d at 312 (citing *Estelle v. Gamble*, 429 U.S. at 107). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id. See also Daniels v. Williams*, 474 U.S. 327, 332 (1986) (negligence not actionable under Section 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under Section 1983.

## 2.    Application of Legal Standards

Defendants do not appear to contest that the plaintiff suffered from a serious medical condition in connection with his open-heart surgery and post-operative recovery.  However, as discussed further below, there are not material facts supporting plaintiff's claim that he was denied adequate or reasonable medical care or that the defendants acted with deliberate indifference to his medical needs.

### a.    Defendant Miller

Plaintiff does not contest the adequacy or reasonableness of the medical care that he received from Dr. Miller in connection with his heart surgery.  Instead, he claims that Dr. Miller denied him constitutionally adequate medical care by (1) failing to ensure that his post-operative instructions were received and followed by the medical staff at Shawangunk; (2) failing to respond to the letters plaintiff wrote to the surgeon complaining about his post-operative care; and (3) failing to conduct a follow-up examination of the plaintiff.  (Complaint at 12, ¶ 6).

The DOCS medical records confirm that the Shawangunk medical staff did, in fact, receive Dr. Miller's discharge instructions regarding the plaintiff.  (Miller Aff. ¶ 32; DOCS-279-280, 292-293, 304-305).  In light of the clear documentary evidence, the plaintiff's conclusory claim that the surgeon's directions regarding post-operative care were never forwarded to the prison does not create a factual dispute.  *See Benitez v. Pecenco*, 92 Civ. 7670, 1995 WL 444352 at n.5, 1995 U.S. Dist. LEXIS 10431 (S.D.N.Y. July 27, 1995) (plaintiff's conclusory allegation that he was never issued medication was directly contradicted by medical records and was insufficient to create

25

a factual dispute on that issue) *(citing Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case")).

Dr. Miller acknowledges that the plaintiff wrote him once, in January 2007, claiming that his pain medication had been stopped too early and that he was not being given appropriate post-operative care. (Miller Aff. ¶ 35; Ex. F-3, Dkt. No. 96-39 at 1). Although plaintiff alleges that he wrote Dr. Miller on three occasions with questions about his care, he has provided no documentary support. (Complaint at 9, ¶ 30). Dr. Miller explanation of why he did not respond is reasonable and certainly does not evidence a deliberate indifference to plaintiff's medical needs:

> It is my belief that none of my cardiothoracic patients, including the plaintiff, would require pain medication nearly eight months after surgery. Routinely surgical patients are discharged back to the cardiologist for follow-up. Certainly, if the cardiologist had any concerns about a patient's possible need for subsequent surgery or further medication, he or she would have contacted my office."

(Miller Aff. ¶ 36). DOCS referred plaintiff to Dr. Miller later in 2007 (after plaintiff filed his complaint), and he conducted an examination.

Dr. Miller had no control over if and when DOCS would refer a inmate to him for a follow-up examination after the inmate had been returned to the care of the prison medical staff. (Miller Aff. ¶¶ 30, 31). Under those circumstances, he can not be liable under Section 1983 for not getting involved earlier in plaintiff's post-operative care. *See, e.g., Smith v. Woods*, 9:05-cv-1439 (LEK/DEP), 2008 WL 788573 at *9, 2008 U.S. Dist. LEXIS 22191 (N.D.N.Y. March 20, 2008) (social

worker and psychologist in prison had no authority to override the decision of the treating psychiatrist regarding appropriate medication for an inmate/patient; further, they had no reason to know that the psychiatrist was not appropriately treating the plaintiff); *Young v. Smith*, 2009 WL 3733048 at *5, 2009 U.S. Dist. LEXIS 102965 (emergency room doctor, who referred plaintiff to surgeon promptly, could not be held liable for any delay by the surgeon in performing surgery).  *See also Cuoco v. Moritsugu*, 222 F.3d 99, 111 (2d Cir. 2000) ("A doctor associated with a prison cannot be held responsible for failing to intercede in the treatment of a prisoner simply because the prisoner button-holes him and insists that he do so. . . . [The prison psychiatrist's] refusal to intervene in the medical treatment of another doctor's patient simply because the patient demanded it was objectively reasonable as a matter of law.")

Plaintiff's conclusory and unsupported allegations do not create a material issue of fact supporting his claim that Dr. Miller provided unreasonable care or acted with deliberate indifference to his medical needs.  Accordingly, this court recommends that Dr. Miller's summary judgment motion be granted.

### b.   Defendants Genovese and Capone

Plaintiff also claims that defendant Genovese, his primary treating physician at Shawangunk and defendant Capone, the consulting cardiologist who examined him at least four times, provided him constitutionally deficient post-operative medical care. In particular, plaintiff claims:  (1) these doctors did not ensure that he was appropriately excused from strenuous prison labor, which impeded his recovery and

27

caused him considerable pain; (2) they did not ensure that he was scheduled for a follow-up examination with his surgeon, pursuant to post-operative instructions; and (3) they did not recommend or prescribe adequate prescription medication, in particular sufficient medication to manage his post-operative pain. (Complaint at 9-10).

The defendants' conduct with respect to these specific issues must be viewed in the broader context of the extensive and continuing medical care and treatment they provided to plaintiff following his surgery, as described in the factual discussion above. *See  Estelle v. Gamble*, 429 U.S. at 107.  Plaintiff's disagreement with particular medical decisions by the defendants and conclusory allegations of deliberate indifference do not negate the extensive evidence that Dr. Genovese and others reasonably and diligently addressed plaintiff's medical needs over an extended period of time.  Further, although plaintiff provides some explanation for his periodic refusal of prescribed medication and recommended treatment, his non-compliance with the directions of the medical staff undermines his conclusory claims of deliberate indifference on the part of the DOCS physicians.  *See Jones v. Smith*, 784 F.2d 149, 151-52 (2d Cir. 1986) (plaintiff's history of declining treatment by prison doctors undermined his claim that they were deliberately indifferent in failing to treat his back issues).

### i.      Work Assignments

Plaintiff alleges that Dr. Genovese and Dr. Capone knew that, despite clear medical orders that he was not to engage in heavy lifting, pushing, or pulling, he was

being required to engage in strenuous physical labor contrary to those directions. However, the DOCS medical records for April and May 2006 do not reflect any complaints from plaintiff about his work or other indications that he was being required to engage in physical activities contrary to the doctor's instructions. (D41-D45, D99). Several entries seem inconsistent with plaintiff's claim that he was doing strenuous work during the month following his surgery, when Dr. Genovese ordered that he be excused from a.m. and p.m. work programs.[12] In any event, there is no evidence in the record to support plaintiff's conclusory claim that the prison doctors knew and deliberately ignored that he was being required to engage in work that was inconsistent with their medical instructions. These doctors cannot be liable under Section 1983 if the defendant engaged in inappropriate work contrary to their medical direction and without their knowledge.[13] *See, e.g., Atkinson v. Fischer*, 9:07-cv-368 (GLS/GHL), 2009 WL 3165544 at *11, 2009 U.S. Dist. LEXIS 88480 (N.D.N.Y. Sept. 25, 2009) (granting summary judgment in favor of defendants who were not in any way involved in inmate plaintiff's job assignment).

---

[12]   See, e.g., May 3, 2006 entries on D-43 ("Feels OK. . . .  No chest pain.  Pt states does some walking."); May 10, 2006 notes of consultation with Dr. Capone on D-99 ("Still in pain . . . .  Continue limited upper body exertion.").

[13] As a consultant, Dr. Capone recommended diagnostic or therapeutic measures to prison doctors, but did not have the authority to prescribed medications, arrange for outside consultations, or alter an inmate's work schedule. (Capone Aff. ¶ 2).  Plaintiff does not concede Dr. Capone's lack of authority with respect to inmate patients, but has no apparent factual basis for his position on this issue. (Pltf. Dec., Dkt. No. 102-1 at 6-7).  Thus, Dr. Capone may also rely on the argument that he cannot be liable for decisions and actions of others with respect to plaintiff's work assignments. *See  Smith v. Wood*, 2008 WL 788573 at *9; U.S. Dist. LEXIS 22191; *Young v. Smith*, 2009 WL 3733048 at *5, 2009 U.S. Dist. LEXIS 102965; and *Cuoco v. Moritsugu*, 222 F.3d at 111, discussed in Section II. D. 2. a. above.

The medical records document that Dr. Genovese repeatedly provided medical orders directing that plaintiff not engage in heavy lifting, pushing, and pulling.  (D95-98).  And, when, months after plaintiff's surgery, there was some indication that plaintiff was performing inappropriately strenuous labor, perhaps because he missed doing heavy work, Dr. Genovese took additional steps to stop that.[14]  This court concludes that there is no factual support for the plaintiff's claim that the DOCS physicians acted with deliberate indifference in how they addressed work restrictions for him following his surgery.  *See, e.g., McCray v. Coughlin*, 101 F.3d 1392 (table), 1996 WL 368722 at *2, 1996 U.S. App. LEXIS 16002 (2d Cir. 1996) (prison doctor who revoked plaintiff's "general pass," requiring him to seek specific permission before he would be excused from a work program, did not act with deliberate indifference, particularly when he subsequently issued a month-long direction excusing plaintiff from lifting more than 20 pounds); *Estelle v. Gamble*, 429 U.S. at 100-101, 106-107 (inmate who alleged doctors did not credit his repeated assertions that severe back pain should preclude him from manual labor did not state a claim for deliberate indifference where the medical staff repeatedly saw and treated him, even if their lack of diagnosis and inadequate treatment constituted malpractice).

### ii.    Follow-up Examination by Specialist

While plaintiff is correct that the Shawangunk facility did not refer plaintiff for

---

[14] *See, e.g.,* D28 (notes of 9/27/06 medical appointment: "Find out what his program is. He should not be lifting > 10 lbs.); D14 (notes of 7/19/07 medical appointment: "Told again no lifting says to me if I can't do that, what am I going to do. . . .wants to do heavy work"; DOCS-326 (7/19/07 memorandum of Dr. Genovese to the Programming Committee: "This patient is not to do any heavy lifting pushing or pulling.")

a follow-up examination by his surgeon in the months following his surgery, he was referred to be examined by cardiologist, Dr. Capone, on at least four occasions.  All of plaintiff's treating doctors, including his surgeon, agreed that follow-up care provided by a cardiologist was medically appropriate.  (Miller Aff. ¶ 36; Capone Aff. ¶ 17; Genovese Aff. ¶ 25).  Plaintiff's disagreement with his treating doctors that he should have been seen promptly by his heart surgeon, as opposed to a cardiologist, does not support a claim for deliberate indifference.  *See, e.g.*, *Dawson v. Williams*, 04 Civ. 1834, 2005 WL 475587 at *6, 2005 U.S. Dist. LEXIS 3059 (S.D.N.Y. Feb. 28, 2005) (failure to refer inmate patient to a vascular surgeon, after he had been examined by several other specialists, did not constitute deliberate indifference where there was no evidence that the consult was necessary to adequate treatment or to avoid a substantial risk of injury); *Mills v. Luplow*, 04-CV-005, 2009 WL 2579195 at *19, 2009 U.S. Dist. LEXIS 81459 (W.D.N.Y. Mar. 30, 2009) (inmate patient's complaint that he should have been referred to an oral surgeon, as opposed to an ear, nose, and throat specialist, was a disagreement over medical judgment rather than a demonstration of deliberate indifference); *Nelson v. Rodas*, 01CIV7887, 2002 WL 31075804  at *14-*15, 2002 U.S. Dist. LEXIS 17389 (S.D.N.Y. Sept. 17, 2002) (citing cases) (inmate's complaint that the prison refused his request for a CAT scan and consultation with a specialist concerning his back spasms was not the proper basis for an Eighth Amendment claim).

After his last examination of plaintiff on March 23, 2007, Dr. Capone recommended a consultation with the thoracic surgeon in light of plaintiff's repeated

31

complaints of lingering chest wall pain.  (Capone Aff. ¶ 18; D113).  Dr. Genovese

approved the referral to the thoracic surgeon on April 18, 2007.  (DOCS-206, 208).

Dr. Miller examined plaintiff on June 18, 2007 at Albany Medical Center.  Dr. Miller

concluded that any pain plaintiff was experiencing was not cardiac in nature, but was

musculoskeletal.  He recommended that a cardiologist could do any appropriate

follow-up.  (Miller Aff. ¶¶ 38-42; Ex. F-1, Dkt. No. 96-37, at 1-4; DOCS-207; D125).

 *Evans v. Manos* suggests how a prison inmate's claim for a delay in medical

treatment should be evaluated under the Eighth Amendment:

> "Although a delay in medical care can demonstrate deliberate indifference to a
> prisoner's medical needs, a prisoner's Eighth Amendment rights are violated
> only where 'the delay reflects deliberate indifference to a serious risk of health
> or safety, to a life-threatening or fast-degenerating condition or to some other
> condition of extreme pain that might be alleviated through reasonably prompt
> treatment.'" . . .

*Evans v. Manos*, 336 F. Supp. 2d 255, 262 (W.D.N.Y. 2004) (citations omitted).  The

Second Circuit has not resolved whether actual adverse medical effects are required,

as a threshold matter, to state a viable Eighth Amendment claim relating to delayed

medical care; but has indicated that a plaintiff must at least show that the delay

significantly increased the risk for medical injury or similar serious adverse

consequences.  *Smith v. Carpenter*, 316 F.3d at 188-89, n.14, n.15.  The Court in

*Smith* also observed, in the post-trial context, that, "although demonstrable adverse

medical effects may not be required under the Eighth Amendment, the absence of

present physical injury will often be probative in assessing the risk of future harm."

*Smith v. Carpenter*, 316 F.3d at 188.

In this case, it is clear that the delay in the referral of plaintiff for a follow-up examination by his surgeon, during which time he was seen four times by a cardiologist, did not result in any adverse consequences to the plaintiff or increase the risk of adverse effects.  Moreover, there is no evidence to support plaintiff's conclusory allegation that the decision to have plaintiff examined by a cardiologist instead of his surgeon was motivated by any improper indifference to his medical care. *See, e.g., Pabon v. Goord*, 99 Civ. 5869, 2003 WL 1787268 at *10-11, 2003 U.S. Dist. LEXIS 5359 (S.D.N.Y. Mar. 28, 2003) (delay of several years in referring inmate patient to a neurosurgeon was not deliberate indifference when there was no showing the delay was motivated by disregard for his care, no evidence that the delay had any significant impact on the eventual course of treatment, and ample documentation that his medical needs were otherwise addressed during the delay).

### iii.    Medication

Plaintiff also alleges that Dr. Genovese and Dr. Capone failed to prescribe the medications specified by the surgeon and, thereafter, failed to prescribe adequate medication to manage his severe pain.  The affidavits of the doctors and the supporting medical records establish that, Dr. Genovese did, in fact, prescribe the post-operative cardiac and pain medications recommended by Dr. Miller, although she substituted a few drugs with different brand names, but the same active ingredients.  (Genovese Aff. ¶¶ 11, 12; Miller Aff. ¶¶ 29, 33).  Plaintiff's conclusory allegations to the contrary do not create an issue of fact.  *See Benitez v. Pecenco*, 1995 WL 444352 at n.5, 1995 U.S. Dist. LEXIS 10431.

33

Plaintiff's remaining claim regarding medication is that Dr. Genovese, and to a lesser extent, Dr. Capone, failed to prescribe or recommend medication that was sufficiently potent to treat his serious pain.  The factual record, discussed above, establish that Dr. Genovese, following the advice of Dr. Miller and Dr. Capone, prescribed Percocet to plaintiff during the month following his surgery–in April and May 2006.  She also prescribed Percocet to plaintiff for a period in July 2006; but did not do so in August 2006, contrary to the recommendation of Dr. Capone.  In his affidavit, Dr. Capone noted, "The facility physician is tasked [with overseeing the delivery of medication] as he/she is more involved with the day to day treatment of each inmate and is thus more knowledgeable into the individual needs and concerns of each inmate.  For example, the facility physician may have more information into an inmate's addiction or drug abuse history and thus is a more appropriate source to make final medication decisions."  (Capone Aff. ¶ 10).

During the time period that Dr. Genovese was not willing to treat plaintiff with potent prescription pain killers like Percocet, she tried a variety of other medications in an attempt to manage plaintiff's claimed pain–Tylenol, Ibuprofen, Naprosyn (a NSAID), and Robaxin (a muscle relaxant).  Plaintiff was resistant to Dr. Genovese's efforts to wean him from Percocet and periodically refused these alternatives.  (Genovese Aff. ¶ 16).  Plaintiff claims that Dr. Genovese once told him that she would no longer prescribe pain medications because he was "a drug addict."  (Pl. Aff., Dkt.

34

No. 102-2 at 3, ¶ 18).[15]  Dr. Genovese only indirectly responds to this allegation by stating "My provisioning of pain medication to plaintiff was based upon my own medical judgment after observing and treating the patient following his surgery." (Genovese Aff. ¶ 17).

Differences in opinions between a doctor and an inmate patient as to the appropriate pain medication clearly do not support a claim that the doctor was deliberately indifferent to the inmate's "serious" medical needs.  *See, e.g., Evans v. Manos*, 336 F. Supp. 2d at 262, 263 (inmate's opinion that doctor should have prescribed something stronger than Advil and a back brace does not give rise to an issue of fact as to whether his constitutional rights were violated); *Veloz v. New York*, 339 F. Supp. 2d 505, 525 (S.D.N.Y. 2004) (inmate's disagreement with his medical provider about whether he needed something stronger than Tylenol for his back pain did not constitute deliberate indifference to a serious medical need); *Morrison v. Mamis*, 08 Civ. 4302, 2008 WL 5451639, 2008 U.S. Dist. Lexis 106416 (S.D.N.Y. Dec. 18, 2008) (doctor refusing to switch prescription pain killers or allow use of Ben Gay by an inmate complaining of back pain and migraines does not give rise to an deliberate indifference claim), Report and Recommendation adopted by 2009 WL 2168845, 2009 U.S. Dist. Lexis 61772 (S.D.N.Y. July 20, 2009).  Nor does the fact that Dr. Genovese and the consulting cardiologist disagreed, at one point, whether Percocet was the appropriate medication for plaintiff support a deliberate indifference

---

[15] Plaintiff's medical history included an acknowledgment of substance abuse, albeit in the distant past.  (Pltf. Aff., Dkt. No. 102-2 at 3, ¶ 18; DOCS-354).  He also noted that he was in the drug treatment program at Shawangunk.  (Complaint at 9, ¶ 29).

claim. *See Ortiz v. Makram*, 96 Civ. 3285, 2000 WL 1876667 at \*9-\*10, 2000 U.S. Dist. LEXIS 18428 (S.D.N.Y. Dec. 21, 2000) (primary prison doctor was not deliberately indifferent to an inmate patient's serious medical needs when, after reviewing the report of a consulting urologist, he determined, in his medical judgment, to prescribe a different pain killer than Percocet, as recommended by the specialist).

Plaintiff does not provide any support for his claim that Dr. Genovese was motivated by an improper disregarded for his medical needs other than his allegation that she once stated she was denying him Percocet because he was a drug addict. However, as Dr. Capone's statement (quoted above) suggests, concern about prescribing narcotic pain medication, on which inmates with possible substance abuse issues could become dependent, may inform a medical judgment about what drug to prescribe. *See, e.g., Rivera v. Dyett*, 88 Civ. 4707, 1994 WL 116025, 1994 U.S. Dist. LEXIS 3732 (S.D.N.Y. Mar. 28, 1994); *Espinal v. NYS Department of Correctional Services*, 9:06CV596, 2009 WL 799951 at \*5, 2009 U.S. Dist. LEXIS 25127 (N.D.N.Y. Mar. 24, 2009); *Ortiz v. Makram*, 2000 WL 1876667 at \*10, 2000 U.S. Dist. LEXIS 18428.  In sum, there is no factual support for plaintiff's claim that Dr. Genovese's decisions regarding the pain killers she prescribed reflected deliberate indifference to his serious medical needs, as opposed to her honest medical judgment.

### iv.    Conclusion

Plaintiff's conclusory and unsupported allegations do not create a material issue of fact supporting his claim that Dr. Genovese and/or Dr. Capone provided unreasonable care or acted with deliberate indifference to his medical needs.

Accordingly, this court recommends that the summary judgment motion of the DOCS

defendants be granted with respect to plaintiff's Eighth Amendment claim.

### c.    Defendant Wright (Personal Involvement)

Plaintiff claims that Defendant Wright, the DOCS Chief Medical Officer,

should be liable for deliberate indifference to his medical needs.  Plaintiff alleges that,

in response to his complaint to Dr. Wright that he was not receiving sufficient pain

medication, Dr. Wright delegated responsibility to investigate and reply to another

DOC employee, who advised that plaintiff's treating physician was the final arbiter

with respect to medical decisions regarding medication.  (Complaint at 12-13, ¶ 9).

While not contesting plaintiff's allegations about how his complaint to Dr. Wright was

handled (*see* DOCS-330), defendant persuasively argues that he was not personally

involved in plaintiff's medical care to the extent required to make him liable under

Section 1983.[16]  In any event, the determination that there no constitutional violation

---

[16] Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability.  *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003).  Plaintiff's letter of complaint to Defendant Wright is insufficient to establish personal involvement by the DOCS Chief Medical Officer, because he referred the matter to a subordinate for decision and did not personally make any medical decisions regarding the plaintiff.  *See, e.g. Gonzalez v. Wright*, 07-Civ-2898, 2009 WL 3149448 at *22-*23, 2009 U.S. Dist. LEXIS 91461 (S.D.N.Y. Sept. 30, 2009) (DOCS Medical director not personally involved in alleged deprivation of adequate medical care by virtue of the fact that he received a complaint from plaintiff and delegated it to a subordinate for response) (*citing Sealely v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (DOCS commissioner was not personally involved in alleged constitutional violation where he only referred plaintiff's complaint to a subordinate for decision)).  Even if Dr. Wright had ignored plaintiff's complaint, it would not make him liable under Section 1983 for the alleged constitutional violations.  *See, e.g., Greenwaldt v. Coughlin*, No. 93 Civ. 6551(LAP), 1995 WL 232736, at *4, 1995 U.S. Dist. LEXIS 5144 (S.D.N.Y. Apr.19, 1995) ("[I]t is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations.").

relating to the decision of the DOCS medical staff regarding plaintiff's pain medication would necessarily negate Section 1983 liability on the part of the Chief Medical Officer.

### E.    Fourteenth Amendment Claim

Plaintiff's complaint states a vague Fourteenth Amendment cause of action which references both due process and equal protection.  (Complaint at 4, 14).  The apparent basis for this claim is the allegation that Dr. Genovese refused to prescribe certain potent pain medication to plaintiff based on her perception that he was a drug addict.  This court concludes that this cause of action is mis-pled and essentially duplicates plaintiff's Eighth Amendment claim that Dr. Genovese was deliberately indifferent to his serious medical need for particular pain medications.

### 1.    Legal Standards

The Equal Protection Clause of the Fourteenth Amendment provides that the government shall treat all similarly situated people alike. *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995) (*citation omitted*).  Generally, the equal protection clause has been "concerned with governmental 'classifications that affect some groups of citizens differently than others.'" *Engquist v. Or. Dep't of Agric.*, __ U.S. __, __, 128 S. Ct. 2146, 2152 (2008).  However, an equal protection claim can sometimes be sustained even if the plaintiff does not allege "class-based" discrimination and instead claims that he has been irrationally singled out as a "class of one." *Id*. (internal quotations omitted).

To establish an equal protection violation, the plaintiff must show that the

38

defendants applied a different standard to similarly situated individuals. *Wiggins v. N.Y. City Dep't of Corr.*, 06 Civ. 1946, 2008 WL 3447573 at *8, 2008 U.S. Dist. LEXIS 61262 (S.D.N.Y. Aug. 12, 2008) (citing *Skehan v. Village of Mamaroneck*, 465 F.3d 96, 111 (2d Cir. 2006)).  Plaintiff must first show that he was treated differently than others similarly situated because of intentional or purposeful discrimination. *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005).  Then, plaintiff must show that the difference in treatment cannot survive the appropriate level of scrutiny. *Id*.  "The Equal Protection Clause permits distinctions which are based on a person's disability, if they are rational and serve a legitimate end." *Wiggins v. N.Y. City Dep't of Corr.*, 2008 WL 3447573 at *8, 2008 U.S. Dist. LEXIS 61262 *(citing Garcia v. State Univ. of N.Y. Health Scis. Ctr.*, 280 F.3d 98, 109 (2d Cir.2001) ("Where disability discrimination is at issue, the Fourteenth Amendment only proscribes government conduct for which there is no rational relationship between the disparity of treatment and some legitimate governmental purpose.")).  In a "class-of-one" claim, the Equal Protection clause requires a "rational basis for the difference in treatment." *Id*. (citing *Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).

### 2.    Application of Legal Standards

Even accepting as true the plaintiff's unsupported allegation that Dr. Genovese denied him narcotic pain medication because she perceived him as a drug addict, plaintiff states no viable equal protection claim.  Assuming that actual or perceived "drug addicts" constitute a viable "class" under the Equal Protection Clause, prison authorities may treat members of such a group differently than non-addicts, as long as

the disparate treatment is rationally related to a valid public policy goal.  *See Burka v. New York City Transit Authority*, 680 F. Supp. 590, 602 (S.D.N.Y. 1988) (Transit Authority's employment restrictions on illegal narcotics users and perceived users would not violate the Equal Protection Clause to the extent the different treatment of this "class" bears a rational relationship to policy goals) *(citing Reed v. Reed*, 404 U.S. 71, 75 (1971)).  For prison medical officials dispensing narcotic pain medications on which inmates could become dependent, it is hardly irrational to consider the inmate's perceived addiction or history of substance abuse as a factor in making the medical judgment about what drug to prescribe.  *See, e.g., Rivera v. Dyett*, 1994 WL 116025, 1994 U.S. Dist. LEXIS 3732; *Espinal v. NYS Department of Correctional Services*, 2009 WL 799951 at *5, 2009 U.S. Dist. LEXIS 25127; *Ortiz v. Makram*, 2000 WL 1876667 at *10, 2000 U.S. Dist. LEXIS 18428.

In any event, plaintiff's Fourteenth Amendment cause of action essentially duplicates his Eighth Amendment claim that Dr. Genovese denied him narcotic pain medication because of deliberate indifference to his genuine medical needs based, in part on her purported mis-perception that he was a drug addict.  This issue has been addressed under the rubric of the Eighth Amendment, and does not need to be considered as a equal protection cause of action.  *See, e.g. Toney v. Goord*, 04-CV-1174, 2006 WL 2496859 at *12, 2006 U.S. Dist. LEXIS 60987 (N.D.N.Y. Aug. 28, 2006) (equal protection claim that prison doctor refused to treat inmate "drug addict" while he was in segregated housing as a result of his illegal use of narcotics would be addressed as an Eighth Amendment medical care claim); *Lighthall v. Vadlamudi*, 9:04-

40

CV-721, 2006 WL 721568 at *15-16, 2006 U.S. Dist. LEXIS 74737, 2006 U.S. Dist. LEXIS 74734 (N.D.N.Y. Mar. 17, 2006) (Fourteenth Amendment due process and equal protection claims based on alleged indifference to plaintiff's medical needs were "disguised" Eighth Amendment claims and would be treated as such).

### F.   Qualified Immunity

Plaintiffs Genovese, Capone, and Wright have argued that they are entitled to qualified immunity because they "acted reasonably" in providing medical treatment to the plaintiff.  Given the conclusions discussed above that the defendants did not violate any constitutional right of the plaintiff, this court does not need to address the claims of qualified immunity.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendant Miller's motion for summary judgment (Dkt. No. 96) be GRANTED;

**RECOMMENDED**, that the motion for summary judgment of Defendants Genovese, Capone, and Wright (Dkt. No. 97) be GRANTED; and

**RECOMMENDED**, that plaintiff's complaint be DISMISSED in its entirety.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28

U.S.C. § 636(b)(1); Fᴇᴅ. R. Cɪᴠ. P. 6(a), 6(e), 72.


Dated: February 17, 2010


Hon. Andrew T. Baxter
U.S. Magistrate Judge